Elliott H. VELGER, Plaintiff-Appellant,

v.

Donald F. CAWLEY, Police Commissioner, City of New York, et al., Defendants-Appellees.

No. 912, Docket 75–7042.

United States Court of Appeals, Second Circuit.

Argued May 28, 1975.

Decided Sept. 9, 1975.

See also, D.C., 366 F.Supp. 874.

Sam Resnicoff, New York City, for plaintiff-appellant.

W. Bernard Richland, Corp. Counsel, New York City, for defendants-appellees.

Before CLARK, Associate Justice,* and HAYS and MANSFIELD, Circuit Judges.

CLARK, Associate Justice:

In this appeal of his case brought under 42 U.S.C. § 1983,[1] Elliott H. Velger, appellant, seeks reversal of a judgment refusing: 1) his reinstatement as a probationary patrolman with the New York City Police Department; and 2) the re-

---

* Associate Justice, United States Supreme Court (Ret.) sitting by designation.

1. Title 42 of the United States Code, Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory subjects, or causes

to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit, in equity, or other proper proceeding for redress.

covery of damages for injury to his reputation because of his summary dismissal. On February 16, 1973, he was dismissed without cause, without a hearing, and without being apprised of the grounds therefor.[2] Velger had enlisted in the force as Patrolman, Police Trainee, on January 30, 1970. He served in that position until August 15, 1972, shortly after his twenty-first birthday, when he was elevated to the position of probationary Patrolman. He remained in this position until his abrupt dismissal. He had served three years and had only five more months to serve on his probationary period.

While prosecuting his suit, Velger sought other employment. On September 10, 1973, he was provisionally employed by the Penn Central Railroad as a patrolman-watchman. He had placed fourth out of twenty applicants in competitive testing for the position. But after some sixty days with the Penn Central, he was discharged solely because of the results of an inspection of his personnel record in the New York City Police Department. He had granted Penn Central authorization to see his records on file at the Department. The trial judge found that Penn Central "gleaned" from Velger's personnel file that he "had been dismissed because while still a trainee he had put a revolver to his head in an apparent suicide attempt."[3]

Velger's subsequent attempts to secure work included taking over one hundred civil service examinations, of which he passed ninety-seven per cent and scored many high marks. There is every indication that he would have been successful but for the allegations in his New York City Police Department file.[4] In the private sector, he applied for numerous positions,[5] but was ultimately refused employment; again his personnel file seems to have prevented his employment.[6]

The trial court dismissed the complaint in two stages: first, by holding that Velger's status was probationary and hence he had no property right in the position, and, second, by finding that he had failed to meet his burden of proof that a stigma had attached because of his discharge. Judgment was entered for the City of New York and its officials on all

2. The suit was filed on May 25, 1973, against Donald F. Cawley, Police Commissioner, Patrick Murphy, former Police Commissioner, Harry I. Bronstein, Personnel Director and Chairman of the New York City Civil Service Commission, and Abraham Beame, as Comptroller, City of New York, and the City of New York. The appellant originally sought a mandamus requiring the defendants to reinstate him and an order empanelling a three-judge court to test the constitutionality of Section 63 of the New York Civil Service Law, McKinney's Consol.Laws, c. 7. Section 63 mandates probationary periods for New York civil servants and was the authority for the regular one-year probationary term Velger was serving when he was dismissed.

The district court held the claim as well as the request for a three-judge court to be "frivolous" under this Court's ruling in *Russell v. Hodges*, 470 F.2d 212 (2d Cir. 1972). See *Velger v. Cawley*, 366 F.Supp. 874 (S.D.N.Y.1973).

3. Velger was not made aware of the accusation. In his brief, he says:

Since the alleged incident occurred at the Police Academy and 'four or five individuals' were involved appellant should have been given an opportunity to explain. It might all have been a little horseplay . . .

4. A typical example was the Plainfield, New Jersey, Police Department. It told Velger that his hiring date would be three weeks from the receipt of its notification unless a character investigation required that he be turned down. He was notified but then never hired. Other police positions included: the police departments of Yonkers, N.Y., Jersey City, N.J., and Washington, D.C.; the Triborough Bridge Authority; the Executive Protective Service; Suffolk County Police; and others.

5. Among the companies to which Velger applied for security police positions were American Bank Note Company, Bonwit-Teller, several Manhattan banks, and the Penn Central Railroad.

6. Ironically, at the time of trial Velger was employed on a probationary basis in a clerical position with the New York City Police Department. That job, too, was terminated at the expiration of the probationary period on January 17, 1975.

issues. We do not agree. We find it unnecessary to decide whether Velger had a property right in his position and we do not reach that point. We do, however, find that a stigma attached because of his dismissal and that he was, therefore, entitled to a hearing to confront the allegations placed in his personnel file. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

1. *The Nature of the Charge on which Dismissal was Predicated:*

It stands to reason that any charge that justifies dismissal is a most serious one. Here the exact language of the charge is not known,[7] but it appears to state that Velger "while still a trainee . . . had put a revolver to his head in an apparent suicide attempt." Such a charge suggests to most of us such severe mental illness that it deprives one of the capacity to do any job well. It thus differs from the usual derogatory charge that is levelled at the capacity to do a specific job. Certainly, no more serious charge could be levelled at a police officer.

Moreover, the "rookie" officer has the greater hazard because he has none of the job protection guarantees that a seasoned officer enjoys. Ordinarily, he can be severed from the force without any notice of charges or a hearing being afforded him. Police authorities must, therefore, exercise the greatest degree of care in dealing with probationary officers to make certain not only that their discharge decisions are just but also that their reasons are kept confidential. Here New York City admits that it grants ready access to its confidential personnel files to all governmental police agencies. In a case like the present one this could have the effect of closing the public sector to the probationary police dischargee and depriving him of employment in the largest and most desirable segment of his profession. The same result, in reality, is true in the private sector because New York City answers all inquiries for permission to see personnel files with the suggestion that inspection will be permitted with the consent of the dischargee. The dischargee is then placed "between the devil and the deep blue sea"; he loses whatever his choice. Who would employ an applicant who refused to give authorization? Who would employ one who gives authorization but whose file suggests that he made an "attempt" at suicide?

2. *The Requirements of Procedural Due Process:*

 In light of the rationale behind both *Board of Regents v. Roth,* supra, and *Perry v. Sindermann,* supra, we must reverse the lower court's judgment. Those cases teach that when either a deprivation of a property interest, such as in a permanent job, or a deprivation of liberty, such as in a stigma that operates to foreclose other employment opportunities, result from the decision to discharge, due process requires that notice of the charges and a hearing must be granted to the dischargee. Perhaps the discharge of a police officer is stigmatization *per se.* But we need not announce such a "brass-collar" rule, for here the record reeks of the stigma that attached to Velger. The stigma foreclosed employment in both the public and private sectors. First, the manner in which personnel records are made available to inquiring public and private employers insures that serious derogatory information in the file will stigmatize

---

**7.** Appellees resisted all efforts to obtain from them an explanation for the dismissal. Their response to Velger's formal interrogatories prior to trial included the claim that as a probationary patrolman he had no right to a statement of reasons for his termination. The testimony of the Penn Central officer, who investi- gated Velger's personnel file about the apparent suicide attempt report, was that the attempt incident was the reason for the dismissal. No other explanation was ever offered. Indeed, appellees resisted Penn Central's attempts to verify the report.

the dischargee. Second, the lax procedures in the practice of the New York City Police Department, as it discharges probationary officers without a statement of reasons or hearing, encourage the very harm that *Roth* and *Perry* urged be prevented. Here, from what little is known, Velger's accusers are not named and his actions are not described in any detail. The framework in which the alleged suicide attempt occurred included the presence of five fellow trainees, but no explanation exists for such an unlikely audience to an attempted suicide. No date or hour for the incident is specified. Although it allegedly occurred while Velger was a trainee, his appointment to patrolman was seven months old and he had been with the force three years before the discharge action, supposedly based upon the earlier incident, was taken.

As this Court so well stated in *Lombard v. The Board of Education of the City of New York*, 502 F.2d 631 (1974):

> A charge of mental illness, purportedly supported by a finding of an administrative body, is a heavy burden for a young person to carry through life. A serious constitutional question arises if he has had no opportunity to meet the charge by confrontation in an adversary proceeding. *Id.* at 637–8.

3. *The Remedy:*

We, therefore, hold that the findings of the trial court that no proof of stigma was made are clearly erroneous. This result need not have any material impact upon the practice of not affording a hearing to probationary dischargees. The appellees could change their disclosure procedures to prevent the dissemination of derogatory and possibly stigmatizing allegations unless notice of the charges and a hearing are first afforded to the dischargee. Otherwise, rudimentary procedural due process requires that such notice of charges and a hearing be afforded before a dismissal can be effective. Reversed.